Charles L. **HARDTKE**, Plaintiff,

v.

**LOVE TREE CORPORATION**, an Iowa
Corporation, et al., Defendants.

Civ. A. No. 72–C–139.

United States District Court,
E. D. Wisconsin,
Milwaukee Division.

Jan. 3, 1975.

**1086**

Bruce C. O'Neill, Milwaukee, Wis., for plaintiff.

Roger Radue, Madison, Wis., for Loomis.

Thomas W. McKay, Dubuque, Iowa, for Love Tree, W. Skaife, R. Skaife.

## DECISION AND ORDER

WARREN, District Judge.

On March 7, 1972, plaintiff Charles L. Hardtke filed a complaint in federal court stating four distinct causes of action premised upon defendants'[1] alleged violations of certain provisions of the Securities Act of 1933, 15 U.S.C. § 77a et seq., the Securities and Exchange Act of 1934, 15 U.S.C. § 78a et seq., and the Wisconsin Uniform Securities Law, Wis.Stats. sec. 551.01 et seq. The matter is presently before this Court on plaintiff's motion for summary judgment[1a] with respect to his second cause of action, which motion is duly opposed by defendants.

Plaintiff's second cause of action alleges that in violation of Wis.Stats. sec. 551.21(1),[2] defendants sold him securities which were neither registered in the State of Wisconsin nor exempt therefrom. He seeks to rescind the transaction and recover the purchase price of the securities plus costs pursuant to Wis.Stats. sec. 551.59(1)(a).[3] Jurisdiction resides in this Court by virtue of the doctrine of pendent jurisdiction as well as the provisions of 28 U.S.C. § 1332(a)(1).[4]

Defendants have countered plaintiff's claim with the assertion that the sale of securities in the defendant Love Tree Corporation was exempt pursuant to Wis.Stats. sec. 551.23(11)(a), which provides as follows:

> "(11)(a) Any transaction pursuant to an offer directed by the offeror to not more than 10 persons in this state, excluding persons exempt under sub. (8), but including persons exempt under sub. (10), during any period of 12

1. Defendant Daniel Ernst is no longer a party to this action inasmuch as the complaint was dismissed on its merits as to him, pursuant to a stipulation executed by the parties, by court order dated and filed on February 14, 1974.

1a. Inasmuch as plaintiff's motion for summary judgment is directed only against defendants Love Tree Corporation, William Skaife, Ronald Skaife, and Ace Loomis, this decision is not applicable as against defendant Samuel Skaife.

2. Wis.Stats. sec. 551.21(1) (1971) provides as follows:
   "(1) It is unlawful for any person to offer or sell any security in this state unless it is registered under this chapter or the security or transaction is exempted under s. 551.22 or 551.23."

3. "(1) Any person who: (a) offers or sells a security in violation of s. 551.21, . . . shall be liable to the person purchasing the security from him, who may sue either at law or in equity to recover the consideration paid for the security, together with interest at the legal rate from the date of payment, less the amount of any income received on the security, upon the tender of the security. . . . Tender shall require only notice of willingness to exchange the security for the amount specified. . . . "

4. "(a) The district courts shall have original jurisdiction of all civil actions where the matter in controversy exceeds the sum or value of $10,000, exclusive of interests and costs, and is between—
   (1) citizens of different States;"

consecutive months, whether or not the offeror or any of the offerees is then present in this state, if the offeror reasonably believes that all the persons in this state are purchasing for investment, and no commission or other remuneration is paid or given directly or indirectly for soliciting any person in this state other than those exempt by sub. (8)."

It is defendants' position, as stated in their Answer, that inasmuch as offers of their securities were made to less than ten persons, sec. 551.23(11)(a) operated to exempt such securities from the *registration requirement*. In addition, defendants claim the existence of material issues of fact which would preclude the entry of summary judgment at this time.

The facts hereinafter recounted are not in dispute and are ascertainable from the uncontroverted affidavit of plaintiff,[5] submitted in support of his motion for summary judgment, defendants' answers to plaintiff's interrogatories and, in particular, the transcript of the testimony of defendant William Skaife, given by him in a state criminal proceeding and filed herein on January 8, 1974 as an exhibit for purposes of this motion. Plaintiff is and at all times pertinent herein has been an adult resident of Milwaukee, Wisconsin. In December of 1970, defendant William Skaife, a resident of Dubuque, Iowa, as organizer, president, and a director of the defendant Love Tree Corporation,[6] initiated several telephone communications between himself in Dubuque and the plaintiff in Milwaukee and in addition directed correspondence from Dubuque, Iowa, to the plaintiff in Milwaukee, Wisconsin, through the United States mail regarding the nature of defendant Love Tree Corporation, its prospects, and plaintiff's investment in the corporation.

Between January 17 and January 28, 1971, defendants William Skaife and Ronald Skaife, also a director of the defendant corporation, personally met with plaintiff at St. Mary's Hospital in Milwaukee, Wisconsin, and resumed solicitation of his investment in the defendant corporation. Furthermore, during that same period of time, defendant Ace Loomis, another director of the defendant corporation, initiated telephonic communications between himself in Des Moines, Iowa, and plaintiff in Milwaukee, Wisconsin, to the same end.

On January 28, 1971, while at St. Mary's Hospital in Milwaukee, Wisconsin, plaintiff paid $7,500 to the defendant corporation through defendant William Skaife for the purchase of a convertible debenture of the defendant Love Tree Corporation with warrants convertible to 12,500 shares of common stock in the corporation. Shortly thereafter, the

---

5. Although plaintiff's affidavit restates several of the factual allegations of his complaint, defendants cannot simply rely upon the denials in their Answer to establish issues of fact regarding the matters attested to in the affidavit. Rule 56(e) of the Federal Rules of Civil Procedure provides:

"(e) Form of Affidavits; Further Testimony; Defense Required. Supporting and opposing affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein. . . . The court may permit affidavits to be supplemented or opposed by depositions, answers to interrogatories, or further affidavits. *When a motion for summary judgment is made and supported as provided in this rule, an adverse party may*

*not rest upon the mere allegations or denials of his pleading, but his response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. . . . "* (Emphasis added).

In view of the fact that defendants do not set forth *any* facts in opposition to those stated in plaintiff's affidavit, the facts as recounted therein are accepted as accurate and undisputed.

6. As president of the defendant Love Tree Corporation, defendant William Skaife testified that it was his responsibility to raise the necessary capital to finance the corporation. Circuit Court of Milwaukee County Case No. H-4427, Transcript of the Testimony of William Skaife (hereinafter referred to as 'Transcript'), pp. 5, 6.

defendant corporation's convertible debenture was mailed by the defendant corporation through its agents from Dubuque to Whitefish Bay, Wisconsin, followed by a further exchange through the mail of plaintiff's debenture for a certificate representing 12,500 shares of common stock in the defendant corporation.

On March 19, 1971, another meeting was held between defendant William Skaife and plaintiff in Shorewood, Wisconsin, whereby defendant William Skaife solicited from plaintiff the purchase of additional shares of stock in the defendant corporation. This meeting was in turn followed by two subsequent meetings between the same parties, one occurring at 424 East Wisconsin Avenue, Milwaukee, Wisconsin, on March 20, 1971, and the other occurring on or about March 23, 1971 in Dubuque, Iowa. Pursuant to these latter negotiations, plaintiff paid the defendant corporation, through defendant William Skaife, the sum of $10,000 for the purchase of a certificate of stock representing 25,000 shares of common stock in the defendant Love Tree Corporation. The money exchanged hands in Dubuque, Iowa. The certificate of stock, however, was mailed by the defendant corporation through its agents from Dubuque to the plaintiff in Whitefish Bay, Wisconsin on or about April 7, 1971.

Aside from its offers and sales of securities to plaintiff, the defendant corporation, primarily through the efforts of defendant William Skaife, offered and sold its securities to other Wisconsin residents. Those residents included the following:

(1) William Schaller—offer in May or June of 1970; sales on April 7 and June 23, 1971;

(2) William Broderson—offer in June of 1970; sale on June 23, 1971;

(3) Pat Gallagher—offer in October or November, 1970; sale on December 20, 1970;

(4) James Barry, Jr.—offer in December, 1970; sale in December, 1970 or January-February, 1971;

(5) John Fazio—offer on or about March 31, 1971; sale on April 7, 1971;

(6) William O'Rourke—offer in April, 1971; sale on June 23, 1971.

In addition to the foregoing, the defendant corporation, through defendant William Skaife, entertained numerous contacts of a less identifiable nature with other Wisconsin residents. It is the nature of these contacts about which the controversy principally centers. In late 1970, the latter part of April or early May, 1971, and in June 1971, William Skaife entertained discussions with a Mr. Fred Loebel,[7] Roy Hanson and Ben Stone, respectively, regarding the defendant corporation. Skaife explained that his procedure with respect to Wisconsin residents was initially to "send them a tree so they got the excitement and thrill of receiving these things." He would then meet with them and discuss his ideas for the development of the corporation with great detail and enthusiasm:

"I went into great detail. I met with some people two, three times, had meetings with them, went into—sent them trees, and test marketing, went through great elaborate procedures of showing them what a great idea this was and interest them, but never said to them, 'Would you like to buy stock,' this figure for this amount, unless I was sure they were interested in doing it." (Transcript, p. 24.)

Moreover, Mr. Skaife admitted during the state court proceedings that in April or May of 1971, he made an offer to sell securities in the defendant corporation to an unidentified man in Janesville, which offer was not accepted (Transcript, p. 25).

Finally, William Skaife admitted to several contacts with two diverse groups of people. The first of these groups

---

7. Mr. Skaife, in his answers to plaintiff's interrogatories, filed herein on October 29, 1973, pointedly admits the existence of specific discussions with Fred Loebel concerning the purchase of stock in the defendant corporation.

was comprised of five or six individuals of a venture capital group represented by Mr. Michael Burns, with whom Mr. Skaife met in March, 1971. At that time, defendant Skaife made a full presentation to them and distributed projection materials. The second group of individuals was comprised of five or six doctors, with whom Mr. Skaife met on two or three occasions in the spring of 1971. With respect to these meetings, Mr. Skaife testified:

"I had two meetings with—where Dr. Foley was present and several other doctors, and then we had one meeting where there were like four or five or about that many other doctors there. And I made a full presentation to the group, and I said to them, 'If at any time there is to be any kind of an offer or a discussion on the purchase of stock here, it's imperative that I talk with one person; otherwise, I will be violating the securities law.' There was never a discussion with any individual about the purchase of stock in that group, but there were three discussions on the explanation of the product and what we were doing and what have you." (Transcript, p. 32).

His purpose, moreover, was to ascertain whether the extent of the individuals' interest would warrant future discussions regarding the purchase of stock:

"I was seeing if their interest justified using up an offer and using up the raising of the funds that the company needed. . . .

". . . I was interested in hopefully—I think bringing in enough interest to discuss a future stock sale with them, stock purchase, but we didn't get that far. . . ." (Transcript, pp. 32–33).

█ . If these latter contacts constitute 'offers' within the meaning of the Wisconsin Uniform Securities Law, the defendants would have extended some 22 offers to Wisconsin residents during the period from May 31, 1970 to June 1, 1971, nullifying any exempt status

claimed by defendants pursuant to Wis. Stats. sec. 551.23(11)(a). Defendants have argued, however, that this Court is precluded at this time from making any such determination in view of the existence of material issues of fact. First of all, they cite the prior adjudication in the state court criminal proceedings in which the Honorable Max Raskin, Milwaukee County Circuit Court Judge, dismissed the case against defendant William Skaife. They argue that this dismissal presents a genuine issue of fact as to whether any of the defendants illegally sold unregistered securities in the State of Wisconsin.

The Court, having read and studied the transcript in question, finds defendants' assertion totally without merit and somewhat incredible. It is readily apparent from the transcript of the state court proceeding that the criminal case against Mr. William Skaife was dismissed solely because the State of Wisconsin had chosen to charge Mr. Skaife with an offer to more than ten persons during the period from March 30, 1970 to April 1, 1971. Thus, any contacts or offers made after the April 1 date were necessarily irrelevant, and within that defined period the transcript discloses that defendants had made at most but seven offers. In the instant action, however, the Court is not bound by the March 30, 1970 to April 1, 1971 time period but may look to the number of offers made during *any* consecutive twelve-month period. Moreover, the Court is inclined to agree with plaintiff that had the State not chosen the twelve-month period ending April 1, 1971 or had defendant William Skaife recalled for purposes of the state court proceeding that the meeting with the Burns group occurred in March, 1971 and not in late spring or early summer of 1971, the case would not have been dismissed but would have been allowed to go to the jury. Although Judge Raskin granted defendant William Skaife's motion to dismiss, he specifically found that Skaife's contacts in the State of Wisconsin, particularly with the doctors

in May of 1971, constituted offers within the meaning of the Wisconsin Uniform Securities Law:

"I also consider that what occurred in the month of May, 1971, at the meeting of the doctors to be within the definition of (11)(b) of Section 551.01 [551.02] which is the definition of the word 'offer' and there, two critical words are used.

"We know what an offer is in law where there are specific conditions set out for the buyer or the offeree to accept or reject. But I think whoever drew this definition expanded on the word 'offer,' because it says it includes every attempt and it additionally includes every solicitation.

.    .    .    .    .    .

"Now, if we lay that side by side with what the testimony is, it would appear to this Court at least that the defendant in this case in presenting his company to this group of doctors was in effect attempting to make an offer, and not only that, but he certainly was soliciting them for the purchase. Soliciting means, of course, the desire to sell, putting your best foot forward, as the defendant himself has stated. It would not be much for someone from that group to have said, 'Well, I'm interested. Tell me what I have to do. How much is your stock?' Et cetera. And that would be the complete accomplishment of it." (Transcript, pp. 106–107).

■ Defendants' second challenge to the entry of a decision on plaintiff's motion for summary judgment is stated in terms of the situs of their second transaction with plaintiff. They argue that since plaintiff admits that he personally met with defendant William Skaife in Dubuque, Iowa on March 23, 1971, and there paid Love Tree Corporation the sum of $10,000 for the purchase of a certificate of stock representing 25,000 shares of common stock in the defendant corporation, there exists "a clear fact issue concerning whether this transaction was covered by the securities laws of the State of Wisconsin." Defendants could not be more inaccurate in their characterization of this issue. The question of whether the singular act of transferring possession of a check in Dubuque, Iowa brings the second sale of stock without the purview of the Wisconsin Uniform Securities Law is not a factual issue but a *legal* issue, whose resolution the Court will undertake herein.

■ As heretofore demonstrated, Wis.Stats. sec. 551.21 (1) prohibits either the offer or sale of a security unless the security is registered or the transaction is exempt. Thus, in determining whether Wisconsin law governs a transaction, the Court looks to whether the activities of the defendants herein constituted an offer or a sale of securities, as those terms are defined. Nor is this Court bound to interpret the terms "sale" and "offer to sell" in conformity with their common law definitions. *See e. g.,* Kreis v. Mates Investment Fund, Inc., 473 F.2d 1308 (8th Cir., 1973). For purposes of determining coverage under the Wisconsin Uniform Securities Law, the terms "sale" and "offer to sell" are defined by Wis.Stats. sec. 551.-02(11), which provides as follows:

"(11)(a) 'Sale' or 'sell' includes every sale, disposition or exchange, and every contract of sale of, or contract to sell, a security or interest in a security for value.

"(b) 'Offer' or 'offer to sell' includes every attempt or offer to sell or dispose of, or solicitation of an offer to purchase, a security or interest in a security for value, . . ."

■ Having examined the facts relative to the second sale of securities to the plaintiff by defendants in light of the terms defined by sec. 551.02(11), the Court concludes that there is no question but that defendants' activities herein and the sale pursuant thereto fall within the purview of the Wisconsin Securities Law. The record discloses that defendants conducted and had conducted all preliminary negotiations and solicitations of plaintiff in the State of Wiscon-

sin, personally appearing in Wisconsin for that purpose. Moreover, although plaintiff transferred his money to the defendant corporation in Dubuque, Iowa, the certificate of stock was mailed to plaintiff in Wisconsin. The fact that defendants conducted their extensive solicitations of plaintiff's purchase of stock in Wisconsin, which solicitations qualify as an 'offer' under sec. 551.-02(11)(b), would alone be sufficient to bring this transaction within the purvew of the Wisconsin Securities Law. Thus, the fact that a portion of the transaction may have occurred in some other state is not controlling. In this respect, the Court's ruling is supported by substantial precedent.

The Seventh Circuit Court of Appeals, in deciding a similar controversy has reached a like result. In the case of Green v. Weis, Voisin, Cannon, Inc., 479 F.2d 462 (7th Cir., 1973), the plaintiffs were all residents of Chicago, Illinois or its suburbs. Each of them, with the exception of one, had been solicited in the State of Illinois for the sale of common stock in London Ben, Inc. by the defendant Weis, Voisin, Cannon, Inc., the underwriter and agent for the sale of London Ben stock. Each of the plaintiffs accepted the offer to purchase by signing an investment letter and forwarding it, with a check, to defendant's offices in Illinois.

Plaintiff Rosentone, also an Illinois resident, had been solicited for the purchase of London Ben stock while vacationing in Florida. He had signed an investment letter while in Florida and had likewise mailed it to defendant's Chicago office. Confirmations on each of the sales were issued and mailed to all plaintiffs at their Chicago addresses.

The federal district court, ruling on the issue of whether Illinois law governed the transactions, had determined that the "sale" of securities [8] to the plaintiffs did not occur in the State of Illinois. Its finding was premised upon the fact that after plaintiffs' checks and investment letters were received in Chicago by defendant Weis, Voisin, Cannon, Inc., the checks were forwarded by the defendant to its New York offices and deposited in its New York bank account, from which state the confirmations and stock certificates had also issued.

The Seventh Circuit Court of Appeals, however, reversed the lower court, ruling instead that defendant's solicitation of the Illinois residents and other contacts with that state pursuant to such solicitations were sufficient to bring the various transactions within the definition of "sale" and thus the purview of the Illinois Securities Act:

". . . The defendants in this case offered to sell the securities in question in solicitations made to persons all but one of whom were in the state at the time of the solicitation, by representatives in Illinois, received acceptances of their offer in Illinois from persons all but one of whom were in Illinois at the time of the mailing of the acceptance, and mailed confirmations and stock certificates to Illinois residents at their Illinois addresses. Whether or not a common law definition of sale would therefore place the consummation of the sale in New York is therefore irrelevant to the statutory definition. Defendants became subject to the statute at least when they successfully completed the sale of London Ben stock after soliciting offers to buy in Illinois. To construe the language of the statute otherwise would permit an issuer or dealer to solicit sales at will in Illinois without complying with the statute, so long as an act entirely within the seller's control, . . . was performed at some other place. Illinois residents should not be so helpless in obtaining protection through their own state

---

8. The State of Illinois makes no distinction between the "sale" of securities or an "offer to sell" securities. Instead, the term "sale" encompasses both a sale and an offer to sell as those terms are defined in the Wisconsin Uniform Securities Law. Green, supra, 479 F.2d 462, 465.

legislature or dependent upon the possibility of aid from the laws of another state, particularly when they might be unable to determine which state would be the state of sale at the time they accepted the offer to purchase." *Green, supra* at 465.

The Court concluded that:

". . . Inasmuch as all preliminary steps were taken in Illinois, the confirmations and stock certificates were delivered in Illinois to Illinois residents, and a sale was transacted in each case, the defendants were subject to the Illinois Securities Act . . ." *Id.* at 466.

Similarly, in Kreis v. Mates Investment Fund, Inc., *supra*, the Eighth Circuit Court of Appeals reversed a decision by the United States District Court for the Eastern District of Missouri, ruling that an offer by plaintiff to purchase securities in the defendant investment fund was accepted in Missouri for purposes of the Missouri Uniform Securities Act, if such acceptance was originally communicated to the offeror in Missouri, *regardless* of the fact that orthodox contract principles would place the situs of the acceptance in New York where the defendant Fund had accepted plaintiff's check and issued the securities.

Most recently, the United States District Court for the Southern District of Iowa has followed the rationale of the Seventh and Eighth Circuit Courts of Appeal in locating the situs of a sale for purposes of the Iowa Securities Act. In Getter v. R. G. Dickinson & Son, 366 F. Supp. 559 (S.D.Iowa, 1973), defendants had argued that a sale of securities did not occur in Iowa within the meaning of the Iowa Securities Act because the agreements for the purchase of the securities had been signed by the sellers in New York, in which state the securities were also delivered. Recognizing that under a restricted view of the scope of the term "sale," as might be contemplated in the field of contracts or secured transactions, the defendants' position might prevail, the court nevertheless concluded that the term "sale" as defined in the Iowa Securities Act encompassed solicitation such that defendant's solicitation of the purchase of securities in the state of Iowa brought the transaction within the purview of the Iowa Securities Act. As to the fact that a portion of the transaction occurred in New York, the Court simply noted that that fact was not sufficient to render the Iowa Securities Act inapplicable:

"The fact that a portion of this transaction took place in New York is not sufficient to place this transaction outside of the provisions of the Iowa Securities Act. The undisputed fact that solicitations were made by the defendants in Iowa along with the other contacts with Iowa noted in this Memorandum are sufficient to hold that the Iowa Securities Act applied to this transaction as a matter of law." *Getter, supra* at 574.

■■ The Wisconsin Supreme Court has repeatedly stated that the broad purpose underlying the Wisconsin Securities Law is the protection of the public from the sale of worthless and fraudulent securities. State v. Woodington, 31 Wis.2d 151, 182, 142 N.W.2d 810, 143 N.W.2d 753 (1966), app. dism. 386 U.S. 9, 87 S.Ct. 854, 17 L.Ed.2d 699; State v. Eisback, 263 Wis. 554, 556, 57 N.W.2d 725. This purpose would be thwarted and the law's protections easily evaded if solicitations could be made in Wisconsin while consummation of the transaction occurs in another state. The Court concludes that it was to prevent such a situation that the Wisconsin legislature proscribed both the "sale" and the "offer" of unregistered or non-exempt securities in such broad terms, and the Court will abide by that intent here.

As concerns defendants' position relative to the existence of two other "material factual" issues, i.e., whether the stock was issued for transfer rather than investment and whether the same person may be counted twice for purposes of tabulating the number of offers

made by defendants in Wisconsin, the Court finds it equally without merit. Plaintiff has assumed no posture incident to this motion alleging that the sales of stock made by defendants were transacted for the purpose of transfer rather than investment. That factual issue is therefore not material nor at all relevant to a resolution of this matter. Furthermore, the latter issue referred to by defendants is not factual but legal. In any event, that issue is similarly irrelevant to a resolution of this matter since neither the plaintiff nor the Court have counted the plaintiff twice in tabulating the number of offers made by defendants in Wisconsin.

Having disposed of defendants' allegations regarding the existence of factual issues, it remains only to consider whether defendants' transactions with the Burns group, the group of doctors and Messrs. Loebel, Hanson and Stone, as described by defendant William Skaife, constitute offers within the meaning of Wis.Stats. sec. 551.02(11) (b). The Court experiences little difficulty in concluding that they do. As earlier noted, sec. 551.02(11)(b) defines the term "offer" to include every attempt to sell or dispose of a security and every solicitation of an offer to purchase. William Skaife's testimony indicates that he did everything to interest these people in purchasing stock in the defendant Love Tree Corporation short of verbalizing the actual offer to sell. He admits that he conducted meetings with them at which he "went into great detail" and used "elaborate procedures" to show them "what a great idea this was and interest them." To conclude that such meetings constituted anything other than the solicitation of an offer to purchase stock would be patently ridiculous. In fact, William Skaife tacitly admitted that such was his purpose. Why else would he have made the following statement to the group of doctors during the course of his meetings with them, if it were not his purpose to solicit offers to purchase stock in the defendant corporation:

". . . 'If at any time there is to be any kind of an offer or a discussion on the purchase of stock here, it's imperative that I talk with one person; otherwise, I will be violating the securities law.' . . ." (Transcript, p. 32).

Defendants apparently are of the opinion that they may legally solicit the offers of any number of people in Wisconsin for the purchase of stock so long as they make or receive only ten *verbalized* offers. This is consistent neither with the definition of "offer" as contained in sec. 551.02(11)(b) nor the intent of a limited offering, as exempted by sec. 551.23(11)(a), which limited offering parallels the private placement exemption under the Securities Act of 1933, 15 U.S.C. § 77d(2). And, as to what constitutes an "offering" under the federal exemption, SEC Release No. 33–4552, November 6, 1972, 27 F.R. 11316 provides:

". . . Negotiations or conversations with or general solicitations of an unrestricted and unrelated group of prospective purchasers for the purpose of ascertaining who would be willing to accept an offer of securities is inconsistent with a claim that the transaction does not involve a public offering even though ultimately there may be only a few knowledgeable purchasers." 1 CCH Federal Securities Law Reporter, ¶ 2772, p. 2919.

Furthermore, in SEC Release No. 33–285, January 24, 1935, 11 F.R. 10952, the General Counsel stated:

". . . The word 'offering' in this sense should not be limited to those cases wherein a formal proposal for a firm commitment is submitted. Any attempt to dispose of a security should be regarded as an offer. I have very serious doubts as to whether in many of those cases where it is stated that an offering is to be made only to an insubstantial number of persons, there may not be *preliminary conversations for the purpose of ascertaining which of various possible purchasers would be willing to accept an offer of the se-*

*curity in question if it were made to them. Any such preliminary negotiations or conversations with a substantial number of prospective purchasers would, in my opinion, cause the offering in question to be a public offering,* thereby necessitating prior registration of the security in question." 1 CCH Federal Securities Law Reporter, ¶ 2741, p. 2911 (emphasis added).

*See also,* United States v. Channel Wing Corporation, 376 F.2d 675, 680 (4th Cir., 1967), wherein the Fourth Circuit Court of Appeals likewise relied upon the criterion stated in this latter release in determining the existence of offers to sell.

For these reasons, now, therefore, it is ordered that plaintiff's motion for summary judgment on his second cause of action be and hereby is granted. Counsel for plaintiff is directed to prepare an order for judgment consistent with this opinion, submitting the same to counsel for defendants for approval as to form only.